UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLORIA PALACIOS MORALEZ,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>THOMAS J. VILSACK, Secretary,<br>United States Department of Agriculture<br><br>　　　　Defendants. | CASE NO. 1:16-cv-00282-AWI-BAM<br><br>**ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**<br><br>**ORDER TO SHOW CAUSE WHY THIS ACTION SHOULD NOT BE DISMISSED FOR LACK OF STANDING** |

**I. Introduction**

Plaintiff Gloria Palacios Moralez ("Plaintiff") brings the instant action alleging violations of the Equal Credit Opportunity Act ("ECOA") and Administrative Procedures Act ("APA") by the Department of Agriculture. Fourth Amended Complaint, Doc. 391 ("FAC.") at ¶ 1. This Court dismissed Plaintiff's ECOA claim as time barred on December 20, 2016. *See* Doc. 405 at 18, 23. Plaintiff's APA claim alleges that the Department of Agriculture's Farmers Home Administration ("FmHA")[1] discriminated against her on the basis of race (Hispanic) and sex (female) in denying her claim for disaster relief benefits.

---
[1] During the 1994 reorganization of the USDA, the FmHA was reorganized into the Farm Service Agency ("FSA"). *See* 7 U.S.C. 6932(a-b) (authorizing the Secretary to establish the FSA and consolidate the farm loan programs previously assigned to the FmHA to the FSA); USDA, *Service Center Agencies: Farm Service Agency*, https://www.sc.egov.usda.gov/AboutSCA.html (last visited September 25, 2016).

1

Defendant now moves for summary judgment regarding Plaintiff's APA claim, contending that Plaintiff is estopped from litigating her APA claim as a result of her failure to disclose the claim in her bankruptcy proceedings and contending that her claim fails on the merits. That matter is fully briefed. Plaintiff moves to supplement the administrative record, contending that such supplementation is necessary to demonstrate discrimination on the part of the FmHA.

Before the Court addresses the parties' motions, Plaintiff will be ordered to show cause why her APA claim should not be dismissed for lack of standing. As an operation of Plaintiff's bankruptcy proceedings, Plaintiff appears to no longer be the real party in interest.

## II. Factual Background

A. The Underlying Loss

Plaintiff is a Hispanic female. FAC at ¶ 17. Beginning in 1980, Plaintiff farmed land that she owned near Fresno, California. *Id*. at ¶ 18. In 1993, Plaintiff lost 57 percent of her raisin crop. Administrative Record, Docs. 431-2, 431-3 ("AR") at 19, 52.[2]

B. Disaster Benefit Applications and Appeals

Following the 1993 loss, Plaintiff submitted applications for disaster relief benefits with the Fresno division of the Agricultural Stabilization Conservation Service ("ASCS").[3] AR at 51, 54. The Administrative Record contains three benefit applications regarding the 1993 loss: September 28, 1993 – attributing the loss to "drastic change in the weather", AR at 51; December 8, 1993 – attributing the loss to "weather fluctuat[ion] [between] high [and] low temp[erature]s," AR at 54; March 2, 1994 – attributing the loss to "Pierce's Disease – wind brought in bacteria from pastures [and] alfalfa. Phomopsis – fungal disease caused from rains last March," AR at 66.

The Fresno County ACS Committee ("COC") never responded to the first application. *See* AR at 19.

---

[2] For the sake of consistency, the page number cited refers to the number in the page footer following the "CA-ASC" prefix. The page number does not refer to the CM/ECF generated electronic document page number in the page header.

[3] The ASCS has since been reorganized into the FSA. *See* Declaration of Navdeep Dhillon, Doc. 431-1 ("Dhillon Decl.") at ¶ 2; *see,* Note 1, *supra*.

The second application was denied on December 16, 1993. AR at 57.[4] The letter from the County Executive Director of the ASCS, memorializing the denial of Plaintiff's application for benefits by the COC, explained that it found "no period of fluctuating weather temperatures during the 1993 crop year which would have occurred at a time that would be expected to have significantly reduced [Plaintiff's] yield." AR at 57. Plaintiff was informed of her right to appeal the denial to the COC and present "factual information and reasons why" she believed the COC's determination was wrong. AR at 57.[5] Plaintiff appealed the denial of the second disaster benefit application to the COC on January 3, 1994. AR at 58-59. On February 8, 1994, Plaintiff appeared before the committee. Plaintiff reiterated her belief that a freeze caused her vines to produce a lower yield. AR at 61. The COC concluded that Plaintiff had not substantiated her claim of frost damage and denied her appeal. AR at 61.

The third application was denied on March 8, 1994. AR at 72; *see* AR at 67-68. The letter from the County Executive Director, memorializing the denial of Plaintiff's third application by the COC, explained that—after consulting with experts—it had concluded that "a 1993 infection" with phomopsis and Pierce's Disease "would not materially affect the 1993 yield." AR at 72, *see* AR at 68. The letter further explained that phomopsis "is a fungus which attacks the vine, but does not harm the bunches of grapes, and cannot be expected to significantly reduce the expected 1993 raisin yield. Phomopsis can also be controlled with adequate cultural practices." AR at 72. "Pierce[']s Disease is carried in the mouths of leafhoppers, and is not an air-born[e] bacteria…. [A]ccording to the viticulturalist, Pierce[']s Disease will cause the vines to die off in a few years, but it will not affect the crop during the year of infection." AR at 72. The COC indicated that it was denying Plaintiff's application for those reasons; Plaintiff's lower yield was not a result of a covered disaster condition. AR at 72, *see* AR at 68. The County Executive Director also informed Plaintiff of her right to appeal the COC determination to the California State ASCS Committee ("STC").

Plaintiff attempted to appeal the denial of her third application to the STC; however, she

---

[4] The denial letter clearly makes reference to the application regarding "high-low weather temperatures." AR at 57.
[5] The procedure allowed appears to have essentially provided a rehearing before the same committee on Plaintiff's claims and an additional opportunity for Plaintiff to substantiate her claims.

was directed by the State ASCS office to file an appeal at the COC level first. *See* AR at 73. Plaintiff requested a rehearing or appeal before the COC. AR at 73. A rehearing before the COC was held on April 26, 1994. AR at 74-77. The COC considered Plaintiffs claims regarding Phomopsis, Pierce's Disease exacerbated by excessive wind, rain while her grapes were drying, and mold. AR at 76-77; *see* AR at 100-102. The COC noted that records of weather conditions did not support Plaintiff's position; that, as the viticulturalists consulted confirmed, the diseases identified would not have caused the extent of loss that Plaintiff identified; and that Plaintiff refused to present information regarding her cultural and management practices. AR at 76-77; *see* AR at 100-102. The COC concluded that any yield reduction was attributable not to any condition that would render her eligible for disaster benefits; the lower yield was likely a result of controllable conditions that could have been prevented through appropriate use of fungicide or pesticide. AR at 76-77, 107.

Plaintiff appealed the denial of all three of her disaster benefit applications to the STC on June 25, 1994. AR at 27-48. The STC set a hearing for August 17, 1994. AR at 25. Part of the basis for Plaintiff's appeal was that she believed that Hispanic farmers were "systemically … left … out" by the COC. AR at 27. At approximately 8:40 a.m. on the date of the hearing, Plaintiff faxed a letter to the STC, indicating that she could not be present at the hearing and explaining what she would have presented to the STC. AR at 117-126. The STC reviewed the written record, including Plaintiff's August 17, 1994 letter, and "f[ou]nd no basis to reverse the determination of the [COC]." AR at 25. It found that Plaintiff "was not able to provide documentation to substantiate the loss was due to an eligible condition. [The viticulturalist's] letter only indicated that Phomopsis would result in 10-20% losses, the chemical receipt did not document the actual usage (amount and dates of application), the Agricultural Commissioner's Pesticide Use Permit indicated no report of use, and Pierce's Disease is not exacerbated by an eligible condition." AR at 25. The STC decision did not resolve the claim of discrimination. AR at 23. Instead, it noted that the "case ha[d] been forwarded to the Director of Equal Employment Opportunity and Civil Rights Staff for review." AR at 23.

Plaintiff appealed the STC decision to the National Appeals Division ("NAD") of the

ASCS. AR at 18. A hearing was scheduled for October 25, 1994, and rescheduled for November 1, 1994. AR at 15, 18. Plaintiff appeared telephonically on November 1, 1994. AR at 15. Plaintiff presented largely the same argument presented to the COC and STC. *See* AR at 12-13. The NAD Hearing Officer considered the record below and the argument presented at the hearing to conclude—for largely the same reasons below—that Plaintiff had not substantiated her contention that an eligible disaster condition caused the damage to her yield. AR at 15-17. He accordingly denied her appeal on March 29, 1995. AR at 17. The NAD Hearing Officer informed Plaintiff of her right to seek review by the director of the NAD. AR at 17.

Plaintiff made a written request for director level review on June 30, 1995. AR at 1. The Director of the NAD issued a decision on March 12, 1996. AR at 1-2. He first outlined the summary of the case and the evidence considered. AR at 1-2. He concluded that there was substantial evidence to support the NAD Hearing Officer's determination that the lower yield "was not caused by an eligible disaster-related condition or by a plant disease that was accelerated or exacerbated naturally as a result of damaging weather." AR at 2. On that basis, he upheld the Hearing Officer's determination. AR at 2.

C. Plaintiff's Bankruptcy Filings

Plaintiff filed a Chapter 12 bankruptcy petition on January 24, 1992. Declaration of Joseph B. Frueh, Doc. 434-4 ("Frueh Decl.") at ¶¶ 2-3; Frueh Decl., Exh. 2, Doc. 434-6 at 2-3. On March 6, 1992, she filed schedules, detailing income, property holdings, and claims by creditors. *See* Frueh Decl., Exh. 3, Doc. 434-7 at 2-20. One of the categories listed on Schedule B, regarding personal property, requires the debtor to list "contingent and unliquidated claims of every nature" and any "other personal property of any kind not already listed." Doc. 434-7 at 5-6.[6] Plaintiff listed a different litigation in both sections. Doc. 434-7 at 5-6. In the March 6, 1992 schedule—filed before the denial of disaster benefits—Plaintiff listed no potential claims against the USDA. The USDA submitted a Proof of Claim for $396,842.25, based on several unpaid loans and accrued interest from 1980 to 1992. Frueh Decl., Exh. 4, Doc. 434-8 at 2-5.

The bankruptcy court confirmed plaintiff's Chapter 12 bankruptcy plan on January 19,

---

[6] As the Secretary correctly points out, and Plaintiff does not dispute, legal claims are personal property.

5

1993. Frueh Decl., Exh. 4, Doc 434-9 at 2-6.

Plaintiff made payments on her bankruptcy plan for four years. Frueh Decl., Exh. 6, Doc. 434-10 at 2. At no time during that period did Plaintiff amend her bankruptcy schedules to identify claims against the USDA. On January 16, 1997, the bankruptcy court discharged all debts provided for by the bankruptcy plan. Doc. 434-10 at 2. At that time, Plaintiff had paid $97,856.75 toward satisfying her debt to the USDA. Doc. 434-10 at 4, 7. On February 21, 1997, Plaintiff's Chapter 12 bankruptcy case was closed. Dc. 434-10 at 6.

While in bankruptcy, Plaintiff agreed to sell her farm to Ermel Ray Moles and Debra Lee Moles for $550,000.00. Frueh Decl., Exh. 18, Doc. 434-22 at 9. After the bankruptcy discharge, Plaintiff breached the purchase agreement. Doc. 434-22 at 10. The purchasers filed an action for breach of contract, seeking specific performance. Doc. 434-22 at 10. Plaintiff twice filed Chapter 12 bankruptcy petitions during the pendency of the action for breach of contract—on December 31, 1997 and on May 21, 1998. Frueh Decl., Exh. 7, Doc. 434-11 at 3; Frueh Decl., Exh. 12, Doc. 434-16 at 3. In both instances, an automatic stay resulted, *see* 11 U.S.C. § 362(a), but that stay was modified to allow the breach of contract action to continue forward. Frueh Decl., Exh. 10, Doc. 434-14 at 2-3; Frueh Decl., Exh. 15, Doc. 434-19 at 2-3. Plaintiff's 1997 and 1998 bankruptcy petition filings both resulted in dismissal. Frueh Decl., Exh. 11, Doc. 434-15 at 2-3; Frueh Decl., Exh. 16, Doc. 434-20 at 2-3.

Ultimately, the purchasers obtained a judgment for specific performance, requiring Plaintiff to sell the farm as agreed. Doc. 434-22 at 10. Plaintiff sold the farm as required on December 30, 1998. Frueh Decl., Exh. 17, Doc. 434-21 at 2. From the proceeds of the sale, $233,336.80 was paid to the FSA. Doc. 434-21 at 2. The remaining debt to the USDA was $176,019.36. Declaration of John Oosterman, Exh. 1, Doc. 434-22 at 2. The USDA cancelled her debt on June 7, 1999. Doc. 434-22 at 5.

D. Plaintiff's Proposed Supplementation Material

After the COC denied Plaintiff's disaster benefit applications, Plaintiff sent a letter to the Secretary of the USDA indicating that she believed that the denial was a result of discrimination and filed an administrative complaint with the USDA on the same basis. Doc. 407-3, 407-4; *see*

Doc. 439-5 at 2. On August 4, 1994, Plaintiff was informed that her claim of discrimination regarding her disaster benefit claim was being reviewed separately by the USDA's Civil Rights Office ("CRO"). *See* Plaintiff's Statement of Disputed Facts, Doc. 439-1 at 8-11 ("PSDF") at ¶¶ 13-15; Doc. 402-7 at 11, Doc. 439-4 at 11; *see* AR at 23 (explaining that the STC appeal contained a discrimination claim that was sent to the Civil Rights Office). .

On June 11, 1998, Plaintiff received the "final decision" from the USDA regarding her discrimination claim. Doc. 439-5 at 2. The CRO determined that Plaintiff "was not discriminated against on the basis of national origin." Doc. 439-5 at 4. It explained that "[t]hirty-nine raisin producers applied for 1993 [disaster] benefits, and initially all were disapproved by the COC. Twenty-six [w]hite producers applied, four were approved. Six Hispanic producers applied, none were approved. Six Asians / Pacific Islander producers applied, one was approved. One Black producer applied, and was not approved…. Even though [Plaintiff's] application was denied for 1993, she had received [disaster] benefits for 1991 due to excessive heat." Doc. 439-5 at 7. Despite the "inference of discrimination," the CRO determined that the determination by the COC—that Plaintiff did not qualify for benefits because the evidence submitted failed to substantiate her claims—was a credible, non-pretextual basis for denial of benefits. Doc. 439-5 at 7.

Plaintiff contends that the record is further incomplete because it fails to include the record before the CRO when it made its discrimination determination. Doc. 440-1 at 6. She "presumes that additional information was generated during those two years" between the NAD's final disaster benefits resolution and the CRO's discrimination determination regarding the disaster benefits determinations. Doc. 440-1 at 6.

### III. Discussion

Defendant moves for summary judgment on two bases: (1) that Plaintiff's claim is barred by judicial estoppel—an affirmative defense external to the administrative record and the USDA's consideration of the merits of her disaster relief claim; and (2) that Plaintiff's APA claim fails on its merits because the agency's determination was reasonable. Because Plaintiff appears to lack prudential standing to litigate the APA claim, the Court will issue an order to

show cause why the APA claim should not be dismissed.

**A. Prudential Standing**

When a debtor files a voluntary petition for bankruptcy for bankruptcy a bankruptcy estate is created. 11 U.S.C. § 541(a); *see* 11 U.S.C. § 301. For all voluntary bankruptcy actions, the estate includes all legal or equitable interests[7] of the debtor in property as of the commencement of the case by filing a bankruptcy petition. 11 U.S.C. § 541(a)(1). "[T]he legislative history indicates that § 541(a) would 'bring anything of value that the debtors have into the estate.'" *Gladstone v. U.S. Bancorp*, 811 F.3d 1133, 1139 (9th Cir. 2016) (citation omitted) ("[P]roperty falls within the reach of § 541(a), unless excluded by § 541(b) or properly exempted under § 522."); *accord Segal v. Rochelle*, 382 U.S. 375, 379 (1966) (A generous definition of the term "property" has been adopted with a view of "secur[ing] for creditors everything of value" belonging to the bankrupt. "An interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.") Such property includes legal and administrative claims. *Caviness v. England*, 2007 WL 1302522, *12 (E.D. Cal. May 3, 2007); *see Dumore v. United States*, 358 F.3d 1107, 1112 n.2 (9th Cir. 2004) (suggesting that a trustee is responsible for administratively exhausting a claim that is an estate asset). When bankruptcy is filed pursuant to Chapter 12, as Plaintiff did in 1992, the bankruptcy estate also includes the debtor's legal and equitable interests in property acquired *after* filing of the bankruptcy petition but *before* the case was closed or dismissed. *See* 11 U.S.C. § 1207(a)(1).

Plaintiff filed a Chapter 12 bankruptcy in 1992. Certainly when she filed for bankruptcy she could not have known about the existence of a crop loss claim when her crop loss did not occur until the 1993 season. On September 28, 1993, and again on December 8, 2013, Plaintiff applied for crop disaster benefits from the Department of Agriculture. Plaintiff's disaster relief application was denied on December 16, 1993. AR at 57. She filed an appeal, alleging discrimination (among other things), on June 25, 1994. AR at 27-48. The alleged discrimination giving rise to the claim now before the Court—that the COC discriminated against Plaintiff on

---

[7] Some exceptions exist but they are not applicable here. *See* 11 U.S.C. § 541(b) (interest as a lessee in certain leased property), (c)(2) (a restricted beneficial interest in favor of the debtor held in trust).

the basis of race and sex—was known and articulated by Plaintiff by June 25, 1994, at the latest. Those claims were part of the bankruptcy estate. If Plaintiff had recovered crop disaster benefits to compensate for the 1993 crop loss, the recovery certainly would have been an estate asset. *See In re White*, 174 B.R. 779 (S.D. Ill. Aug. 8, 1994) (holding that proceeds from crop sales were estate property); *See* 11 U.S.C. § 1207. Plaintiff now seeks to recover for the same injuries.

Because Plaintiff did not list the claims in her asset schedules, the trustee neither administered them nor abandoned them at the close of the bankruptcy case, and they remained the property of the bankruptcy estate. 11 U.S.C. § 554(d). As a result, Plaintiff appears to lack prudential standing to pursue those claims. *See Dunmore*, 358 F.3d at 1112; *Turner v. Cook*, 362 F.3d 1219, 1226 (9th Cir. 2004); *Runaj v. Wells Fargo Bank*, 667 F.Supp.2d 1199, 1206 (S.D.Cal.2009) (A "debtor may not prosecute a cause of action belonging to the bankruptcy estate absent a showing her claims were exempt from the bankruptcy estate or abandoned by the bankruptcy trustee."); *see also* Fed.R.Civ.P. 17(a)(1) ("An action must be prosecuted in the name of the real party in interest.")

### IV. Order

Based on the foregoing, Plaintiff is ordered to show cause by October 30, 2017, why her claim should not be dismissed for lack of standing.

IT IS SO ORDERED.

Dated:  October 17, 2017                              _____
                                                      SENIOR DISTRICT JUDGE